Filed 1/25/16  P. v. Hughes CA

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>OTIS HUGHES,<br><br>        Defendant and Appellant. | A141243<br><br>(San Francisco City & County<br>Super. Ct. No. CT2397734) |

**I.**

**INTRODUCTION**

In 2013, a jury found that appellant Otis Hughes committed a first degree murder in 1991.  Appellant contends that the trial court committed reversible errors during that jury trial by (1) refusing to declare a mistrial after a prospective juror was excused for discriminatory reasons; (2) admitting the victim's autopsy report into evidence under the official record exception to the hearsay rule; and (3) replacing a holdout juror with an alternate after the jury had deliberated for five days.  We find it unnecessary to address appellant's first two claims of error because we conclude that the erroneous removal of a deliberating juror requires us to reverse the judgment.

**II.**

**STATEMENT OF FACTS**

**A.** *The 1991 Murder*

On Wednesday evening, February 27, 1991, Karen Wong was found dead in her home in San Francisco's Richmond District.  Karen's body was discovered by her brother

1

Dale, who went to look for her at the request of her boyfriend Steven Halpern, who had been unable to contact her by phone.[1] When Dale arrived at Karen's home, her lights were on but she did not answer the door, so he retrieved a set of spare keys from his parents, who had accompanied him back to Karen's flat. The family could not get in through the front door because it was chained. With assistance from Karen's downstairs neighbor, Dale broke into her flat through a back door.

Karen was found on the floor under a blanket in a room she used as a study. Her lower body was unclothed and her hands and feet had been bound with an extension cord and an electrical cord from an iron. A serrated kitchen knife was lodged in her abdomen. Pants, underwear, and stockings were in a clump close by.

The police did not find any damage to Karen's doors that Dale had not caused. Lights were on, classical music was playing, and a bathroom window was opened. The home appeared to have been ransacked; there were opened drawers and jewelry boxes, a knocked over plant, and items strewn everywhere. The contents of Karen's purse had been dumped on the dining room table and the telephone cord in the kitchen had been cut. The police also found an unwrapped condom hanging over the side of a trashcan next to the bed in Karen's bedroom.

An autopsy was performed by the city's chief medical examiner, Dr. Boyd Stephens. The autopsy, which included a written report, photographs, pathology tests, and a sexual assault examination, documented a violent death. Karen's hands were swollen and discolored by the ligatures. She had petechiae (dot-like hemorrhages) over the surface of her eyes, and a horizontal mark encircling her neck, both indications that she had been strangled. Karen had been stabbed in the abdomen nine times with a serrated knife. Two of those wounds caused significant internal injuries. The report of the sexual assault exam detailed findings of a large amount of white fluid, large numbers of sperm, and vaginal injuries.

---

[1] For clarity, we refer to members of the Wong family by their first names. No disrespect is intended.

Before their investigation stalled, the police identified Karen's boyfriend, Steven Halpern, as a possible suspect. After Dale found his sister's body, he called Halpern at his home in Berkeley, and Halpern drove to Karen's flat where he was detained outside. Police questioned him for several hours that night and on a subsequent occasion. They also took fingerprints, and blood and saliva samples. In the months following the murder, Halpern and some of Karen's friends conducted their own investigation. Halpern also considered hiring a private investigator, but he never did.

**B. *The Case Against Appellant***

In October 2008, the San Francisco Police Department re-opened its investigation of Karen's murder after receiving notice from the California Department of Justice of a "cold hit" DNA match between Karen's autopsy evidence and appellant. A new reference sample was collected from appellant in December 2008. DNA testing conducted in May 2010 confirmed that appellant's DNA matched sperm cell specimens from the 1991 autopsy. In January 2011, appellant was charged with Karen's murder.

In 2012, investigators arranged for additional DNA testing. Halpern was excluded as a source of sperm collected during Karen's autopsy. A criminalist also analyzed male DNA from the underwear that was found near Karen's dead body; he determined that a treatment applied to the inside of the fabric extracted sperm cells that could have been captured in the material for several weeks and survived multiple washings. The analyst excluded appellant as a possible source of that DNA, but concluded that some of it may have come from Halpern, while another portion of it came from a third party.

Appellant's jury trial commenced on November 5, 2013. In addition to the evidence summarized above, the prosecutor elicited testimony about Karen's romantic life from her brother Dale and her best friend Carol Eng. Both testified that Halpern was Karen's only romantic interest during the period prior to her death. Dale also testified that he had never seen appellant before he was charged with Karen's murder. Nor was Dale aware of Karen ever having an African American boyfriend or of her going on a date with an African American man in 1991.

3

By the time of trial Dr. Stephens had passed away, so the prosecution elicited expert testimony about Karen's autopsy from Dr. Amy Hart, a former colleague of Dr. Stephens and the current chief medical examiner of San Francisco. Dr. Hart offered expert opinions that the autopsy findings were consistent with nonconsensual sexual penetration at or around the time of death, that Karen's death was caused by multiple traumatic injuries, and that the manner of death was homicide.

At trial, the prosecution also introduced evidence of three San Francisco home burglaries for which appellant suffered convictions. The first incident occurred on July 23, 1981, at a home on Jackson Street. At approximately 4:00 a.m. that morning, the residents were awake in an upstairs bedroom and had their downstairs lights on because of a sick child when they were startled by appellant, who appeared in their doorway holding a 10 to 12-inch "sharp tapered" object "bunched up" in his hand. Appellant fled, but was later found in possession of a serrated kitchen knife and other objects he took from the home. After the burglary, the residents and police did not find any signs of a forced entry.

The other two incidents occurred on September 7, 1991. That evening, Barbara Benedict fell asleep on the living room couch in her second floor apartment on Prado Street, leaving her television playing and some lights on. When she woke two hours later, Benedict noticed that a back window had been opened and someone had taken a serrated carving knife from a kitchen drawer and left it on a table near the window. The contents of her briefcase were dumped on the floor, her purse was gone, and a roll of quarters and some stamps were missing from a desk.

Meanwhile, at around 11:00 p.m. that same evening, two undercover police officers spotted appellant in the Marina District where they were investigating a series of recent "hot prowl" burglaries, i.e., burglaries committed while people were home. One officer followed appellant into an alley, noticing he was not wearing gloves. Appellant climbed a ladder onto the deck of a home on Pierce Street, pulled back some blinds covering a sliding glass door, and looked inside the home. Lights were on, the sliding door was opened about two feet, and an older man was watching television inside. After

4

appellant walked away from the door and went down the stairs the officer detained him. Appellant was now wearing gloves and, as the officer handcuffed him, he said "You can't arrest me, I didn't go in there."

## C. *The Defense Case*

The defense attempted to throw suspicion on Steven Halpern. Halpern testified that the last time he saw Karen was the Sunday afternoon before her body was discovered when he dropped her off at her house after she spent the weekend with him in Berkeley. However, in the wake of the murder, a neighbor and friend of Karen's told police that she walked her dog between 10:00 p.m. and 3:00 a.m. on the Sunday and the Tuesday before Karen's body was discovered, and, on one of those occasions, Halpern's car was parked outside Karen's home. Another friend of Karen's reported that Halpern told her that the police suspected him of the murder, but that he was at home eating dinner with his daughter when Karen was killed.

At trial, Halpern testified that he was not allowed into Karen's home the night her body was discovered, or for weeks thereafter. However, he admitted that, when he attempted to conduct his own investigation, he may have asked the neighbor who was with Dale when Karen's body was discovered if he remembered seeing an iron. When asked to explain this fact at trial, Halpern testified that the police had asked him about the iron when they interrogated him and, although they did not disclose that the iron played a role in the murder, he assumed that it had because there would have been no other reason to ask him about it.

The defense also presented evidence that Karen and Halpern had relationship problems. At trial Halpern acknowledged that he and Karen both carried "baggage" from their previous marriages. He admitted they sometimes fought, and during one heated argument she hit him. Halpern also testified that he and Karen broke up for a period of about three months during the latter part of 1990, and that he saw other women during that time. But by 1991, Halpern testified, they were back together, talking about marriage and looking for a home to share. However, the defense introduced excerpts from Karen's diary into evidence which documented ongoing problems Karen had with

5

Halpern in February 1991. For example, she commented that he had lashed out at her, had attacked her for months for no reason, and attacked her about her life.

Karen's friend Christopher Choy was called as a defense witness. Choy, who was married to Karen's friend Carol Eng, testified that Karen confided in him about arguments she had with Halpern. She also told him about her brief breakup with Halpern in 1990, something she had not shared with Carol. Choy testified that during that separation, Karen signed up for a dating service and had her mail from the service sent to Choy and Eng's house. Halpern, who had met Karen by answering her personal ad, testified that he was aware that Karen had signed up with a dating service in November 1990, right around the time they were getting back together after their brief separation.

**D.** *The Jury Verdict*

The jury began deliberating on December 11, 2013. On December 20, the trial court conducted a hearing to address allegations by several jurors that one of them was refusing to consider the trial evidence or to follow the court's instructions. At the conclusion of that hearing, the court found there was good cause to remove Juror 2. (Pen. Code, § 1089.)[2] Juror 2 was replaced with an alternate and, after deliberating for less than a full day, the jury returned its verdict finding appellant guilty of first degree murder. (§ 187, subd. (a).) The jury also found true allegations that appellant committed the murder during a forcible rape (§ 1190.2, subd. (a)(17)(iii)), and that he used a deadly weapon during the crime (§ 12022, subd. (b)(1)). The trial court sentenced appellant to life in prison without the possibility of parole plus one year.

### III.

### DISCUSSION

**A.** *Issues Presented and Standards of Review*

Appellant contends that he was denied his constitutional rights to due process and a fair trial because, after the jury had deliberated for five days without reaching a

---

[2] All statutory references are to the Penal Code unless otherwise indicated.

6

unanimous decision, the trial court invaded the sanctity of the jury's deliberations and then erroneously removed a holdout juror from the jury panel.

The grounds upon which a juror may be removed for good cause are set forth in section 1089, which states: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

"The trial court's authority to discharge a juror includes the authority to conduct an appropriate investigation concerning whether there is good cause to do so, and the authority to take 'less drastic steps [than discharge] where appropriate to deter any misconduct or misunderstanding it has reason to suspect.' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 926 (*Alexander*).)  Trial court decisions about whether and how to conduct such an investigation are reviewed on appeal under the traditional abuse of discretion test.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 712 (*Fuiava*).)

However, "[b]ecause of the importance of juror independence, review of the decision to discharge a juror involves ' "a somewhat stronger showing" than is typical for abuse of discretion review . . . .' [Citation.]" (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71.)  The standard of review applicable to removing a sitting juror requires the juror's disqualification to appear on the record as a " ' "demonstrable reality." ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 141; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 (*Barnwell*).)  "This standard indicates that a stronger evidentiary showing than mere substantial evidence is required to support a trial court's decision to discharge a sitting juror.' [Citation.]" (*Barnwell*, at p. 1052.)  The demonstrable reality test " 'requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion . . .' that the juror was unable to perform his or her duties.  [Citation.]  Although a reviewing court will not reweigh the evidence, we 'must

7

be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]  In reaching that conclusion, we 'will consider not just the evidence itself, but also the record of reasons the court provides.' [Citation.]" (*People v. Debose* (2014) 59 Cal.4th 177, 201.)  This " 'heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' [Citations.]" (*Fuiava*, *supra*, 53 Cal.4th at p. 712.)

## B. *Background*

### 1. The First Five Days of Deliberations

As noted above, jury deliberations commenced on December 11, 2013.[3]  On December 12 and December 16, the jury sent notes to the court requesting to see evidence and to have excerpts from the witness testimony read back.

On December 18, the jury sent a note to the court which stated:  "We have come to a standstill.  11 jurors on one side, one on the other.  Any advice you can impart on us would be much appreciated.  More than one juror has expressed that it might help if there could be clarification on 'reasonable doubt' and 'circumstantial evidence.'  Possibility vs. probability.  Fact vs. imaginary.  Focusing on what is in evidence, not on what is outside. Direct vs. indirect evidence.  Outside biases and how they should be applied.  'Abiding conviction'—what that means."

After consulting with counsel, the trial court informed the jury that the only way it could answer their questions would be to re-read some instructions and provide some advice.  The court then instructed the jury with CALCRIM No. 3551, which sets forth suggestions for overcoming difficulty reaching a verdict, resuming deliberations, and successfully reaching a verdict.  The court also repeated some instructions that were previously provided.  Then it directed the jury to continue deliberating.

---

[3] All subsequent date references are to the 2013 calendar year unless otherwise indicated.

## 2. The Notes from Individual Jurors

On the afternoon of December 18, Juror 2 sent a note to the trial court which stated: "I believe I have performed my jury service to the best of my ability and the evidence did not leave me with an abiding conviction that the charge is true. [¶] I have reached this decision in good faith and with extreme difficulty. Furthermore, I believe racism and bias played a large factor in this deliberation. [¶] Thank you."

By the following afternoon, the court had received six additional notes from jurors complaining about Juror 2. One note stated that the jury was "still at a stand still" because "one lone juror" was refusing to consider the "majority of the evidence, in violation of section 222 [and] section 220." According to this note, the holdout juror refused to "accept" the medical testimony, or give "any weight" to the testimony regarding "the character of the victim." This note stated that the juror was basing his conclusions on "far-fetched 'what-ifs,' " and personal experiences, some of which were described in the note. The note also stated that, on the first day of deliberations, the holdout juror expressed concern about the defendant dying in prison, and that the juror had repeatedly ignored the jury instructions. The note concluded that "I do not see us getting beyond this point."

A second note stated that the jurors had spent five days "going through the evidence carefully," and were "at a bit of an impasse." This juror stated that "[f]or the past few days," 11 jurors had been in unanimous agreement about the verdict based solely on the evidence, while one juror had been unable to "reach any sort of verdict." This juror opined that the holdout was unable to perform his role as a juror, or to follow the instructions. A third note inquired what could be done if a juror was not following the instructions, and if the court could appoint an alternate for a juror who was "not accepting evidence." The fourth note identified Juror 2 as the holdout and complained that he was "ignoring disputing evidence based off his personal beliefs," and that "[w]e are not doing the victim justice by ignoring evidence." A fifth note complained that "[e]leven intelligent jurors have re-examined every piece of evidence," and concluded that appellant raped and murder the victim, but that one juror "refused to consider the

9

evidence." This juror recommended that if the trial ended with a hung jury the defendant should be tried again "as soon as possible." The final note acknowledged that "[w]e are on the verge of being a hung jury," attributing this problem to Juror 2's "antipathy toward Stephen Halprin [*sic*]." This juror also disclosed that 11 of them had gone over all of the evidence in an effort to persuade Juror 2, but to "no avail," and stated that a hung jury would be "a tragic denial of justice" to the victim and her family.

Late in the afternoon of December 19, the trial court directed the jury to report to the courtroom the next day notwithstanding its previous advisement that they would have that day off. The court acknowledged that "you've all gone through the ringer on this and my heart goes out to you, quite frankly." The foreperson for the jury asked whether they would also have to appear the following Monday, December 23, because some of them had booked flights. The court advised that the jury might need to be present that day but said they would definitely have a holiday break from the 24th through the 27th even if they did have to return thereafter.

On Friday morning December 20, the court met with the parties and counsel outside of the presence of the jury to discuss whether to hold a hearing on the allegations of juror misconduct. The defense argued that the court should declare a mistrial without further inquiry because several jurors had made it clear that 11 of them had already decided this case, and if Juror 2 was replaced, those 11 jurors would not be able to start over with an open mind and reconsider the evidence anew. The prosecutor took the position that the court needed to inquire further. The trial court conducted a hearing that afternoon.

### 3. The Trial Court's Inquiry

The trial court's inquiry consisted of individual interviews of each juror who had submitted a note, beginning with Juror 1, the foreperson. The court asked Juror 1 to explain statements in her note that Juror 2 refused to consider the majority of the evidence or to follow the instructions. Juror 1 stated that Juror 2 "did not give any weight to any of the circumstantial evidence in this case," and then asked "if you can't give weight to evidence, how can you weigh the evidence in a case and properly deliberate?"

10

Juror 1 acknowledged that Juror 2 "participated in discussions," and gave the "impression that he was potentially open to discussing some things," but she said that he would never "actually accept any of the circumstantial evidence in the case."

Juror 1 also stated that Juror 2 violated the court's instruction not to consider the penalty when reaching a verdict. She recalled that one of the first comments Juror 2 "made, very passionately, was that he . . . knows that the minimum sentence for murder is fifteen years, which I thought was interesting because I don't know that and I'm an attorney . . . ." Juror 1 also recalled that Juror 2 expressed concern that the defendant would die while in prison. And, according to Juror 1, Juror 2 violated other instructions which required him to explain his "abiding conviction" and other conclusions about what may or may not have actually happened. Juror 1 acknowledged that Juror 2 shared his opinions, but she believed those opinions were based on personal experiences that were "inappropriate" and "far-fetched" and did not logically connect to the case. Ultimately, Juror 1 described the deliberations as "a tragedy." However, she denied the suggestion that any of the jurors based their verdict on sympathy for the victim.

After Juror 1 was excused, defense counsel suggested that they could "nip this in the bud" by admonishing Juror 2 to follow the instruction not to consider the penalty for the charged crime and then ordering the jury to resume deliberations. The trial court rejected this suggestion, and called Juror 10 into the courtroom.

Juror 10 was asked about a comment in her note that Juror 2 was "unable to perform the role of a juror." She explained that he just could not "accept" the evidence. She acknowledged that he appeared to at first, but she complained that he would later say "what if . . . ." She felt that he mixed up "possibility with reasonability," and that his conception of reasonable doubt was "just sort of blurry." Juror 10 also felt that Juror 2 was either unable or unwilling to defend his views by pointing to evidence. Juror 10 did not believe any juror was motivated by a desire to do justice for the victim.

Juror 4 repeated many of the criticisms that Juror 1 had directed at Juror 2. She complained that Juror 2 considered the 15-year penalty for murder; rejected most of the evidence; relied solely on personal experiences that had no connection to the evidence;

11

and failed to understand the concept of circumstantial evidence. Juror 4 also felt that Juror 2 focused too much on the instruction requiring an "abiding conviction" of guilt, while ignoring other important instructions about the evidence. She acknowledged that Juror 2 participated in discussions about the evidence "to some extent," but she complained that he eventually refused to deliberate any further, even when the whole point of further discussion was to address his doubts. Juror 4 admitted that there was some discussion about justice for the victim and she acknowledged that doing justice for the victim impacted her own deliberations, although she was not able to explain how.

Juror 9 was asked to explain a statement in his or her note that Juror 2 was "ignoring disputing evidence based off his personal beliefs." Juror 9 said that when they were talking about the evidence, "putting evidence together," Juror 2 would say he did not want to look at "the pieces" of evidence, but wanted to come up with the "whole picture," which was based on his hunch or gut feeling or a movie he had seen rather than on the actual evidence. Juror 2 also expressed doubts about the evidence and thought there could have been "mistakes with it." For example, Juror 2 suggested that there could have been a mistake in the medical examiner's report or in the way the police collected the evidence and Juror 9 would tell him something "like 'oh my gosh,' you know, at some point you have to reasonably think people do their jobs." The court asked Juror 9 about a comment in his or her note that Juror 2 was not doing justice to the victim. Juror 9 explained that Juror 2 focused on a feeling about not wanting to send somebody to jail when, in Juror 9's view, he should think about doing justice for everybody by looking at the evidence.

Juror 11 was asked to explain a comment in her note that Juror 2 had refused to consider the evidence. Juror 11 responded that "[t]he evidence, to me, and it seems to ten other members of the jury, seems very conclusive that [appellant] committed the crime." Juror 11 said that "we only reached this decision after going over every bit of evidence," but, "after four or five days, there's the one juror, who says he . . . accepts the medical evidence, but then says . . . that despite that, he does not feel beyond a reasonable doubt that [appellant] committed the crime." Juror 11 described the jury as a good group in

12

terms of talking with each other, and said that Juror 2 would "kind of go along with things" to a point, but she complained that he would not accept the ultimate facts, including that the defendant's semen "is proof" that he raped the victim, and that the defendant "tied her up and viciously attacked her with a knife, which was part of his . . . habit in other—not habit but carrying a knife was common." The court asked Juror 11 what Juror 2 would do when these points were made to him and she responded that "[h]e would say, 'It just doesn't seem beyond a reasonable doubt that maybe [appellant] and [the victim] had consensual sex, perhaps outside of the apartment,' and then someone else came in and raped and murdered her later."

The court asked Juror 11 if Juror 2 was willing to discuss the evidence. Juror 11 said the other jurors tried hard to get Juror 2 to show them evidence supporting his position, but he simply did not think that the DNA and "all the other evidence" was conclusive of guilt. Juror 11 acknowledged that justice for the victim came up but said that most of the discussion focused on the evidence. When asked if Juror 2 looked at the photographs, Juror 11 responded "Not very much." When asked if he looked at the other evidence, Juror 11 responded by explaining how the jury evaluated the evidence—they would read and re-read a report and make lists of what they all agreed on, but then Juror 2 would go back to something he had agreed to and tell them why he did not really agree. Juror 11 started to describe a specific example involving the DNA evidence, but the court told her not to go into "all of that." Finally, Juror 11 shared her view that the "jury was very interested in following the rules and doing the right thing. They hung in there through, what, three or four weeks plus five or six days of deliberations."

Juror 3 submitted the note disclosing that 11 jurors conducted an exhaustive review of the evidence in an effort to persuade Juror 2 but they were unable to do so. The court asked whether Juror 2 participated in those discussions. Juror 3 responded "Oh, yes," but then stated that Juror 2 did not "volunteer much." He would respond to direct questions, but often said "I don't know." He was hard to pin down and he clung to "reasonable doubt" without seriously considering the evidence. When asked why she believed Juror 2 never seriously considered the evidence, this juror responded: "Well, he

13

listened to it. He would agree to it, 'yes, but,' and then he would discount it." Juror 3 acknowledged that Juror 2 listened to other points of view and was never arrogant, but she felt that arguments presented to him were like "water off a duck's back." When the court invited this juror to share whatever she wanted and to be as "frank as [she] could be," Juror 3 opined that the public defender's office was "doing a disservice to the cause of justice" in this case. Nevertheless, Juror 3 assured the court that if Juror 2 was replaced with an alternate, she would able to "literally start deliberating anew with a new juror."

Finally, the court spoke with Juror 2, focusing first on the comment in his note that racism or bias was a factor in the deliberations. Juror 2 stated that the foreperson wanted to vote at the very beginning of the deliberations and, although the jury followed his suggestion to wait, it was clear that many jurors had already made up their minds. As deliberations continued, he would mention the lack of evidence that the defendant was capable of such a brutal crime and everyone else just accepted that he did it because of the priors which also involved using a knife. Juror 2 said there was "no real open air of impartiality," and that all of his expressions of doubt were met with "dirty looks." His concern about racial bias was that the other jurors were quick to accept that the defendant was capable of extreme violence even though he had no history of such behavior, but they would not consider that the boyfriend might also have done violence for the first

time.  Also, they would not consider that the victim might have become romantically involved with an African American.[4]

The court asked Juror 2 how he knew the penalty for murder was 15 years to life. Juror 2 said he learned that before the trial, from a friend who worked in the district attorney's (D.A.) office in another county.  When asked for more details, Juror 2 explained that on the day he was called for jury duty, or possibly the following day, he went to dinner with a friend and his friend's boyfriend.  During the  meal, he mentioned that he had been called for a murder trial and the boyfriend, who was a D.A., responded that "you know—that's a big penalty, fifteen years."  Juror 2 said they did not discuss the matter beyond that remark.  Juror 2 also said that he mentioned the possible penalty during deliberations, but the foreperson reminded him about the jury instruction not to consider punishment when deciding about guilt, and he "never mentioned it again, or considered that again during the deliberation."

Juror 2 told the court that he had "[a]bsolutely" looked at all of the evidence in the case.  Other jurors would ask him to ignore certain evidence to see if his opinion might change, but he refused to do that because of the jury instruction that said it was important to consider the totality of the evidence.  The court asked what "details" the other jurors should have considered.  Defense counsel attempted to object but the court pressed for "information," to which Juror 2 responded with the example that he would suggest

---

[4] Juror 1, Juror 10, Juror 4, and Juror 11 denied that racial bias affected the jury deliberations.  Juror 11 further explained race could not have been a factor because the victim and two main suspects were all different racial minorities.  The court did not ask Juror 9 or Juror 3 about racial bias.  Nor did the court make a formal finding regarding Juror 2's allegation of racial bias.  However, during discussion with counsel, it criticized Juror 2 for failing to provide "evidence" or "really anything" to support the statement in his note that other jurors were racially biased.  Defense counsel attempted to clarify Juror 2's concern that some jurors were applying a double standard by dismissing the fact that defendant had no history of violence but refusing to consider that the victim might have had a first-time romantic relationship with an African American man.  The court responded:  "But we honestly don't know if they did or they didn't.  I mean we didn't talk to any of them about it and that's really getting into the mental processes."

15

someone might do something for the first time and the other jurors would say "[t]hat's crazy," or "What's wrong with you? Do you want your sister to get raped?"

After the court completed its inquiry, there was a lengthy discussion with counsel during which the court identified two potential grounds for removing Juror 2: (1) violating the court's instruction not to talk about the case by talking to his "friend, the D.A.," and (2) refusing to deliberate. Ultimately, over a defense objection, the trial court removed Juror 2 from the jury, finding that "based on what I feel is demonstrable reality from these jurors, that he is unable to perform his duty as a juror for the reasons I've stated below and for reasons stated by [the prosecutor]. [¶] And I don't want to take more time to repeat them but I'll accept them."

### 4. The Jury Verdict

An alternate (Replacement Juror 2) was appointed and the jury was instructed to begin deliberations anew. The jury deliberated for 30 to 45 minutes on December 20, and resumed deliberations the following Monday at 9:30 a.m. At around 1:45 p.m., the bailiff notified the court that the jury had reached a verdict, but that Replacement Juror 2 did not want to be present when it was read because she knew people in the audience who had come to support the defendant. Replacement Juror 2 was not willing to share her feelings in a note, so the court held a short hearing with her and the parties. Replacement Juror 2 confirmed that she knew some of the audience members from the "neighborhood" where she used to live, although they were older than her and she had never talked with them. Replacement Juror 2 stated that these individuals did not affect her deliberations, and that she was prepared to announce her verdict out loud in open court. The court asked if Replacement Juror 2 had initially been afraid to do that and she responded: "Well, I was—no. I'm not afraid. It's just that I don't—I don't know what I was actually trying to say then." Replacement Juror 2 reiterated, "No. I'm not afraid, not at all."

After Replacement Juror 2 left the court room the defense moved for a mistrial, arguing that the speed with which a verdict was reached reinforced the defense claim that the 11 jurors were not capable of deliberating anew. Furthermore, sending the jurors back to deliberate after they disclosed that they were split 11 to one in favor of guilt, why

16

they believed the defendant was guilty, and what evidence was important to them, was essentially telling them to go back and return the guilty verdict that the 11 had wanted to reach. Finally, Replacement Juror 2's failure to disclose that she knew people in the courtroom was a ground for disqualification and her assurance that this fact did not affect her deliberations was not credible. The trial court rejected these arguments, and denied the motion for a mistrial. A guilty verdict was read and confirmed by all 12 jurors.

### C. Analysis

"A trial court made aware of the possibility of a juror's misconduct, and particularly possible misconduct occurring during the jury's deliberations, is placed on a course that is fraught with the risk of reversible error at each fork in the road. [Citation.] The court must first decide whether the information before the court warrants any investigation into the matter. [Citation.] If some inquiry is called for, the trial court must take care not to conduct an investigation that is too cursory [citation], but the court also must not intrude too deeply into the jury's deliberative process in order to avoid invading the sanctity of the deliberations or creating a coercive effect on those deliberations [citation]. After having completed an adequate (but not overly invasive) inquiry into the misconduct issue, the trial court must then decide whether, under section 1089, there is 'good cause' to excuse the juror at issue. The court at this final fork might err in declining to dismiss a juror who should have been excused [citation] or excusing a juror who should have been retained [citation]. In making these decisions, a trial court might at times be placed between a rock and a hard place[.] . . ." (*Fuiava*, *supra*, 53 Cal.4th at pp. 710-711, fn. omitted.)

In the present case, there is no question the trial court was caught between a rock and a hard place. While the court's effort to bring the trial to a verdict was understandable, in the process it was unable to avoid committing reversible error that can occur when a trial court is made aware of the possibility of misconduct by a deliberating juror, and then chooses a path to resolve the dilemma which makes confrontation with the defendant's due process rights unavoidable.

17

### 1. The Decision to Investigate

The first decision the trial court faced was whether to investigate the allegations of juror misconduct. (*Fuiava*, *supra*, 53 Cal.4th at p. 710.) At that point, the court was aware of the following facts: The jury had deliberated for five days without complaint before disclosing they were split 11 to one, and that they needed advice about how to proceed. Then, after receiving supplemental instructions and encouragement to resume deliberations, a majority of the jury submitted notes which made it clear that the 11 to one split was a permanent deadlock in favor of guilt.

On these facts, there would have been no question the trial court had the authority to declare a mistrial. "Jury deadlock constitutes necessity for declaration of a mistrial and permits retrial of the defendant. [Citations.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 425-426; see also § 1140 [jury may be discharged after the cause is submitted to them if "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree"].)

Furthermore, several of the jurors who had submitted individual notes violated the court's instruction not to "reveal to me or anyone else how the vote stands on the question of guilt or issues in this case unless I specifically ask you to do so." Those notes disclosed substantive information about the mental processes of this jury, including that 11 jurors were convinced that the defendant was guilty of the charges and that Juror 2's primary disagreement with the other jurors pertained to the weight of the circumstantial evidence. After those improper disclosures, any inquiry designed to avoid a mistrial carried a significant risk that the remaining jurors might interpret the court's actions as approving their point of view. (*People v. Carter* (1968) 68 Cal.2d 810, 816 ["Most cases wherein adjuratory remarks of the court have been held coercive are those in which the court, either through its own questioning or through volunteered statements of jurors, has become informed not only as to the numerical division of the jury but also as to how many stand on each side of the ultimate issue of guilt."].) Under these circumstances, the decision to conduct an inquiry into allegations of misconduct by Juror 2 rather than

declare a mistrial was, at best, an undertaking launched against a torrent of due process concerns.

## 2. The Scope of the Inquiry

If the jury notes did not by themselves compel the trial court to declare a mistrial, there were at least two material problems with the inquiry the trial court conducted to investigate the allegations of misconduct. First, although the court required all of the jurors to appear on a day that had originally been scheduled as a day off, it only questioned jurors who had submitted individual notes. This decision skewed the evidence from the beginning in a way that unfairly impacted the defense because the court elicited information about Juror 2 only from those jurors who had complained about him. (See *People v. Barber* (2002) 102 Cal.App.4th 145, 150-152 [inquiry into juror misconduct "inadequate and fundamentally unfair" when court only questioned jurors who accused holdout of refusing to deliberate].)

Second, while questioning this select group of complaining jurors, the court failed to take meaningful steps to prevent them from further disclosing the mental processes of the jury. On appeal, the Attorney General defends the trial court's inquiry, contending it did not ask a single question that was too invasive. The court itself took a similar view when it acknowledged to trial counsel that some jurors had shared their mental processes, but concluded that the improper disclosures were unsolicited and therefore unavoidable. But our Supreme Court has instructed that "a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations," and it "should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*).) Here, despite the fact that the jury notes forewarned of the complaining jurors' inclination to disclose their thought processes, the trial court asked them open-ended questions without taking appropriate steps to limit its inquiry to a discussion about the conduct of the jurors rather than the content of their deliberations.

19

Of the seven jurors the court questioned, only two were provided with prefatory admonitions not to discuss mental processes, and, in both cases, the court's remarks were more suggestive than directive.[5] Juror 11, who received no prefatory admonition, was allowed to provide extensive details about the jury's analysis of the evidence. When Juror 11 began to describe a specific disagreement with Juror 2 about what the DNA evidence showed, the court did finally say "You can't really go into all of that," but it did not explain why, and then it asked that same juror if there was "anything else" he or she would like the court to know. After Juror 11 was excused, and Juror 3 was already in the courtroom, the prosecutor reminded the court about the need for a prefatory admonition, to which the court responded: "Can you—I'm not allowed to really go into the—the mental processes of the jurors in making decisions, but I still need to somehow ferret out what's going on in there in terms of the notes that have been written to me."

The trial court failed its duty to avoid unnecessarily intruding upon the sanctity of the jury's deliberations. (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) As our background summary reflects, the court's inquiry into allegations directed against Juror 2 was significantly more intrusive than its inquiry regarding possible racial bias or its subsequent interview of Replacement Juror 2, who had disclosed that she knew and was afraid of appellant's friends. Thus, the record shows that the trial court abused its discretion not only by conducting too invasive of an inquiry regarding the first Juror 2, but also by applying a fundamentally different approach to investigate allegations against this holdout juror than it did when investigating possible misconduct by jurors who had already disclosed their intent to vote for a verdict of guilt.

Furthermore, regardless whether improper disclosures about the mental processes of this jury were inadvertent or unavoidable, the trial court was told in no uncertain terms

---

[5] The court asked Juror 1, the first juror it interviewed, to "as much as you can, sort of stay away from" the "mental process that each juror has reached." At the beginning of the next interview, with Juror 10, the court stated, "you should talk from your own personal view," but then added "And try not to talk about mental processes that the jurors were going through, okay."

20

that the jury had voted 11 to one in favor of guilt, and it was provided with extensive information about precisely why Juror 2 evaluated the evidence differently than his fellow jurors.  Under these circumstances, the court's decision to remove only the holdout juror could have had a coercive effect by sending a message to the remaining jurors that the court agreed with their assessment of the evidence, and their conclusion that the defendant was guilty beyond a reasonable doubt.  (*People v. Carter*, *supra*, 68 Cal.2d at p. 816.)

### 3.  The Decision to Remove Juror 2

Finally, we turn to the trial court's decision to remove Juror 2 for good cause and replace him with an alternate, which we review under the demonstrable reality test in order to 'protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.'  [Citations.]" (*Fuiava*, *supra*, 53 Cal.4th at p. 712.)

#### a.  *The Instruction Not To Discuss The Case*

The trial court found there was good cause to remove Juror 2 because of his "discussion with someone else about the trial" after he "was clearly admonished not to do that."  As the court explained:  "I instructed very—in the beginning, I have a big slide up on the podium—on the screen that says, 'Do not talk to anyone about this case.'  Just tell them that you are in a trial.  [¶] And he admitted that he did talk to someone, a D.A., not just his next door neighbor, and received information from the D.A.  I honestly don't believe that's where the conversation ended.  But that's okay; that's the only thing that he said."

The primary problem with this ruling is that the record does not establish that Juror 2 violated an instruction from the court by telling a friend's boyfriend that he was a prospective juror in a murder case.  The court began the jury selection process by providing several panels of prospective jurors with an introductory slide presentation about the jury process.  Although the court covered the same information with each panel, the presentation was not scripted.  For example, the court told the first jury panel: "Do not talk to anyone about this case, about any matter involved with this case."  It then shared an anecdote about a juror whose seemingly innocuous comment to a coworker led

21

to the disclosure of prejudicial information requiring her removal from the jury. However, before sharing this same anecdote with a subsequent panel, the court gave this instruction: "You can tell your friends and others that you are jurors or being summoned as jurors on a murder case and that's about it." Thus, Juror 2's disclosure to his friend's boyfriend that he was a prospective juror on a murder case was something the trial court had specifically authorized at least one group of prospective jurors to disclose.

Secondarily, the trial court did not actually find that the communication between Juror 2 and the D.A. had a prejudicial effect on the deliberative process, nor indeed provide any substantive explanation for its conclusion that this pretrial communication constituted good cause for removal. A " 'nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable "presumption" of prejudice. [Citations.]' [Citation.] However, ' [t]he introduction of much of what might strictly be labeled "extraneous law" cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses; it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated." (*People v. Danks* (2004) 32 Cal.4th 269, 302-303.) Here, the record demonstrates that the communication with the D.A. occurred in a social setting, took place when Juror 2 was only a prospective juror, did not involve a matter that was pending before the jury, and did not actually violate any instruction that had been provided at that early stage in the proceeding.

The Attorney General contends the trial court implicitly found that the D.A.'s contact with Juror 2 was prejudicial because it explicitly found that Juror 2's account of that conversation was not credible. Actually, the court did not make or rely on an adverse credibility finding, but it did express doubt that the discussion Juror 2 had with the D.A. about this case was limited to a comment about the heavy penalty for murder. However, the demonstrable reality test we apply to review a juror removal requires a showing that

the trial court actually relied on evidence that, in light of the entire record, establishes a ground for disqualification. (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.) And, in this instance, the trial court's doubt about Juror 2's account of his dinner conversation was speculation, unsupported by any explanation that would indicate that the court actually relied on evidence in the record. For example, the court did not articulate why Juror 2 would have reason to lie about the conversation. Furthermore, in assuming the discussion must have been improper because the other person was a D.A. rather than just a neighbor, the court overlooked the fact that a D.A. would know not to discuss the substance of a pending criminal action with a potential juror.

Finally, the People argue the conversation was prejudicial because it resulted in a disclosure to the entire jury that the minimum penalty for murder is 15 years. However, the trial court did not find, nor is there any evidence, that this disclosure affected any other juror's performance of his or her duties. As for Juror 2, the disclosure appears to have had a curative effect; he mentioned the 15-year penalty near the beginning of the deliberations, the foreperson reminded him about the jury instruction to not consider the penalty, and he did not raise that issue again. In any event, under our standard of review, we cannot affirm the trial court's ruling on a ground upon which it did not rely (*Barnwell*, *supra*, 41 Cal.4th at p. 1052), and this trial court did not remove Juror 2 for violating the jury instruction not to consider penalty or punishment.

### b. *Refusal To Deliberate*

The trial court did find that Juror 2 could be removed for cause because he refused to deliberate. "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

23

Here, the record contains extensive evidence that Juror 2 participated in the deliberative process. For example, instead of expressing a fixed conclusion at the beginning of the deliberations, Juror 2 objected to the foreperson's proposal to take a vote on the first day of deliberating. He also discussed the evidence with his fellow jurors, shared his opinions and listened to them for five days before he—like several other jurors—submitted a note which indicated that he had reached a final decision. These factual circumstances are antithetical to a finding that Juror 2 refused to deliberate. (Compare *People v. Diaz* (2002) 95 Cal.App.4th 695, 700 [after two hours, juror refused to discuss her opinion other than to say that was how she felt and later told the court that she felt intimidated by other jurors who ganged up on her]; *People v. Watson* (2008) 43 Cal.4th 652, 696-697 [after a single afternoon of deliberations, juror told jury he could not vote for the death penalty under any circumstances and confirmed that sentiment to the trial judge]; *People v. Boyette* (2002) 29 Cal.4th 381, 462 [before deliberations began, juror made it clear to the court that he could no longer be objective].)

Rather than give due consideration to the deliberative process that all jurors, including Juror 2, had engaged in, the trial court instead found there was good cause to remove Juror 2 for refusing to deliberate simply because several jurors had remarked that Juror 2 would not "consider" the evidence.[6] As the court stated during discussions with counsel, "[h]e is required to look at all the evidence and not discount particular evidence. He doesn't have to believe it. He doesn't have to accept it. But he does have to—he can't disregard evidence."

This record does not establish as a demonstrable reality that Juror 2 refused to actually look at the trial evidence. The jurors who accused Juror 2 of refusing to "consider" the evidence all clarified during their interviews that what he actually did was

---

[6] Many jurors also complained that Juror 2 failed to support his position with evidence. This complaint which may have found traction with the trial court is troubling. In light of the prosecution's burden of proof, Juror 2's alleged failure to identify evidence that the defendant was not guilty could not be a proper ground for excusing him. Rather, the pertinent question was whether Juror 2 actually refused to look at the evidence that was introduced at trial. (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

24

refuse to accept that the prosecution evidence, which they found so compelling, was sufficient to prove that the defendant committed murder. For example, Juror 1 acknowledged that Juror 2 participated in discussions, but complained that Juror 2 would never actually "accept" the circumstantial evidence. Juror 11, who also complained that Juror 2 refused to "consider" the evidence, acknowledged that Juror 2 participated in discussions and accepted the DNA evidence, but nevertheless complained because Juror 2 did not feel that the defendant was guilty "beyond a reasonable doubt." The trial court mistakenly relied on these types of accusations because the " 'circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts . . . does not constitute a refusal to deliberate and is not a ground for discharge.' [Citation.]" (*Alexander*, *supra*, 49 Cal.4th at p. 926; see also *Cleveland*, *supra*, 25 Cal.4th at p. 485; *In re Bolden* (2009) 46 Cal.4th 216, 228-229.)

The Attorney General contends that Juror 4's remarks support the trial court finding that Juror 2 actually refused to deliberate. After explaining to the court that the jury spent considerable time working on timelines and pros and cons lists, Juror 4 acknowledged that Juror 2 participated in these discussions "to some extent," but then she complained that "eventually he just kind of refused to deliberate any further." Thus, Juror 4 implicitly acknowledged that Juror 2 did deliberate by participating in discussions about the evidence until he reached a point at which he made a decision that he was unwilling to change. Juror 3 echoed this sentiment by confirming that Juror 2 participated in the jury's exhaustive review of the trial evidence and that he listened to the arguments of other jurors, but that he simply was not convinced by them. Remarks of this nature do not support the trial court's finding because a refusal to be persuaded by fellow jurors does not constitute a disqualifying refusal to deliberate. (See, e.g., *In re Bolden*, *supra*, 46 Cal.4th at p. 229 [juror listened to other jurors, considered but was not persuaded by their opinions, expressed his own views, and did not refuse to speak with or physically separate himself from other jurors]; *People v. Allen and Johnson*, *supra*, 53 Cal.4th at p. 76 [that juror expressed doubts about prosecution case and strength of evidence of guilt and was not persuaded by colleagues' assertions during deliberations

did not constitute prejudgment of case.]; *People v. Karapetyan* (2003) 106 Cal.App.4th 609, 621 [reversible error to remove juror who, after "deliberating fully and completely for more than five days," stated that "he was not going to change his view and was going to vote not guilty"].)

The Attorney General acknowledges there is evidence that Juror 2 was deliberating, but takes the position that conflicting evidence requires us to defer to the trial court's determination which was based on firsthand observations. (Citing *Barnwell*, *supra*, 41 Cal.4th at pp. 1052-1053.) In *Barnwell*, the trial court removed Juror R.D. for a disqualifying bias against police officers, finding that the testimony of nine jurors was more credible than Juror R.D.'s disclaimer. On appeal, the *Barnwell* court afforded deference to the trial court's credibility determination, and ultimately found that the totality of the evidence supported the conclusion that Juror R.D.'s disqualifying bias had been established "to a 'demonstrable reality.' " (*Id*. at p. 1053.)

*Barnwell*, *supra*, 41 Cal.4th at page 1053 is inapposite because, even if we disregard Juror 2's denial that he refused to deliberate, the testimony of the complaining jurors does not support the trial court's conclusion that Juror 2 actually failed to deliberate. Many of them used conclusory language indicative of misconduct to convey their frustrations about Juror 2. But, as laypersons, these jurors likely did not understand that "the court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view." (*People v. Engelman* (2002) 28 Cal.4th 436, 446.) "It is difficult enough for a trial court to determine whether a juror actually is refusing to deliberate or instead simply disagrees with the majority view. [Citations.] Drawing this distinction may be even more difficult for jurors who, confident of their own good faith and understanding of the evidence and the court's instructions on the law, mistakenly may believe that those individuals who steadfastly disagree with them are refusing to deliberate or are intentionally disregarding the law." (*Ibid*.) Here, the substantive descriptions of Juror 2's behavior that were provided to the trial court by the complaining jurors showed that Juror 2 did not fail or refuse to deliberate, but instead participated in

26

deliberations, and then reached a conclusion about the evidence which was intolerable to the complaining jurors.

We do not intend to appear unduly harsh towards the efforts by the trial court, which appear to have been well-intentioned, to resolve a jury impasse occurring well into deliberations on the threshold of the annual December holiday season, and after a lengthy trial. However, our review of this record leads to the inescapable conclusion that the trial court relied on evidence which did not support its conclusion that there was good cause to remove Juror 2 under section 1089, and thus abused its discretion under the demonstrable reality test. In parallel situations, courts have found that the erroneous removal of a holdout juror is necessarily prejudicial. (See *Cleveland*, *supra*, 25 Cal.4th at p. 486; *People v. Elam* (2001) 91 Cal.App.4th 298, 318.) The Attorney General does not argue otherwise. Furthermore, as discussed above, because several jurors disclosed not just the fact that the jury was deadlocked 11 to 1 in favor of guilt, but also their subjective, conjectural ruminations as to precisely why the deadlock had occurred, even if Juror 2 could properly have been excused, the decision to appoint an alternate instead of declaring a mistrial was an independent error requiring reversal of the judgment.

## IV.

## DISPOSITION

The judgment is reversed and this case is remanded for further proceedings consistent with this decision.

27

_____

RUVOLO, P. J.


We concur:


_____

REARDON, J.


_____

RIVERA, J.