[No. S099231. May 4, 2009.]

In re CLIFFORD STANLEY BOLDEN on Habeas Corpus.

COUNSEL

Jeanne Keevan-Lynch, under appointment by the Supreme Court, for Petitioner Clifford Stanley Bolden.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Ronald S. Matthias, Glenn R. Pruden, Nanette Winaker and Frances Marie Dogan, Deputy Attorneys General, for Respondent State of California.

OPINION

KENNARD, J.—A jury convicted petitioner Clifford Stanley Bolden of the first degree murder (Pen. Code, § 187)[1] and robbery (§ 211) of Henry Michael Pedersen. The jury found that petitioner used a deadly weapon for both offenses (§ 12022, subd. (b)), and, as a special circumstance, that petitioner murdered Pedersen while engaged in the commission of the robbery (§ 190.2, subd. (a)(17)(A)). The jury fixed the penalty for the murder at death. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)) and sentenced petitioner to death. On petitioner's automatic appeal, this court affirmed the judgment. (*People v. Bolden* (2002) 29 Cal.4th 515 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

In a petition for a writ of habeas corpus, petitioner now seeks relief from the judgment. He has alleged, among other things, that the attorney appointed to represent him during the capital trial provided ineffective assistance by not specifically asking prospective jurors during voir dire about their prior acquaintance with victim Pedersen, and also that one of the trial jurors, Jose S., displayed bias and committed misconduct by not disclosing a prior relationship with Pedersen, by prejudging the penalty issue, and by failing or refusing to deliberate on penalty.[2] This court issued an order to show cause limited to these claims. In so doing, we made an implicit determination that petitioner failed to state a prima facie case as to the other claims alleged in the petition. (*In re Sassounian* (1995) 9 Cal.4th 535, 547 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Jose S. was selected as an alternate and was seated on the jury during the penalty phase (after the prosecution rested its case in aggravation) when the trial court excused one of the sitting jurors.

After the filing of respondent's return and petitioner's traverse, we determined that there were disputed questions of fact requiring an evidentiary hearing. We appointed as referee the Honorable Mary C. Morgan, a superior court judge, and directed her to supervise discovery, take evidence, and make findings of fact on these questions:

"1. Was Jose S[.], one of the trial jurors, personally acquainted with the victim, Henry Michael Pedersen? If so, when and under what circumstances did they become acquainted, and what was the nature of their relationship?

"2. If Jose S[.] was personally acquainted with Henry Michael Pedersen, would he have disclosed that fact in response to a specific question on voir dire?

"3. Did Jose S[.] prejudge the issue of penalty?

"4. Did Jose S[.] engage in deliberations with the other jurors on the issue of penalty, or did he fail or refuse to deliberate?"

The referee held an evidentiary hearing over eight days, commencing May 23, 2007, and concluding August 6, 2007. At this hearing, the referee heard testimony from eight trial jurors (including Jose S.), three defense investigators, the trial prosecutor, a district attorney investigator, a trial witness, Jose S.'s biographer, and an investigator who had searched San Francisco newspapers for articles concerning petitioner. Thereafter, the referee submitted to this court a 25-page report stating her findings and conclusions. In brief, the referee found that Juror Jose S. was not personally acquainted with victim Pedersen, that Jose S. did not prejudge the issue of penalty, and that he did deliberate with the other jurors on the issue of penalty.

After considering the record of the hearing and the referee's report, we conclude that petitioner's claims lack merit and that the order to show cause will therefore be discharged and, by separate order, his petition for a writ of habeas corpus will be denied.

## I. THE TRIAL EVIDENCE

The evidence supporting petitioner's conviction and sentence has been set forth in *People v. Bolden, supra*, 29 Cal.4th 515, and is summarized here.

At trial, the prosecution presented evidence that victim Henry Michael Pedersen was found dead in his apartment. He had been stabbed to death, and

his body had been wrapped in a bedspread and placed in a bathtub. When last seen alive, Pedersen was in petitioner's company, and petitioner's fingerprints were found in Pedersen's apartment. When the police arrested him for Pedersen's murder, petitioner had property belonging to Pedersen, and he was carrying a knife that was stained with human blood consistent with Pedersen's blood type.

The defense presented evidence at the guilt phase that petitioner had advertised his services as a model or escort in a newspaper called the Bay Area Reporter that circulated primarily in the gay community, and that Pedersen had previously answered a similar newspaper advertisement.

In argument to the jury at the guilt phase, defense counsel asserted that even if the jury concluded that petitioner was responsible for Pedersen's death, the prosecution's evidence was insufficient to prove that robbery was the motive for the killing. Counsel suggested that the jury could reasonably infer that Pedersen gave his property to petitioner in payment for petitioner's services as a model or escort, or, alternatively, that petitioner decided to take Pedersen's property only after Pedersen's death.

The prosecution's case in aggravation at the penalty phase included evidence that on January 3, 1979, in San Francisco, petitioner killed Ernest Cole by slashing his throat with a machete, and that on May 4, 1979, in San Jose, petitioner killed Cruz Ramirez by stabbing him twice in the back with a knife. Petitioner was convicted of voluntary manslaughter for each of these killings. The defense case in mitigation at the penalty phase included evidence about petitioner's childhood and upbringing, as well as testimony by two clinical psychologists and a psychiatrist about petitioner's mental functioning and how certain events and conditions in his life had affected his development.

## II.   The Reference Hearing: Evidence and Findings

### A.   Juror Jose S.'s Prior Acquaintance with Victim Pedersen

Charlia S., one of the jurors at petitioner's capital trial, executed a declaration on August 22, 1996, five years after that trial ended. At the time of the reference hearing in 2007, Charlia S. had died. The referee admitted her declaration into evidence. In the declaration, Charlia S. stated: "One day when we were waiting for the bus, [Jose S.] said he knew the victim, Michael Pederson [sic], a gay man. [Jose S.] referred to the victim as 'Michael' and said 'Michael was a good man.' [Jose S.] said 'Michael' had been in some

kind of trouble when he was younger, and that he ([Jose S.]) helped him get out of that trouble. The trouble had something to do with the Emporium department store. I believe [Jose S.] said he helped Michael Pederson [*sic*] get a job at the Emporium, which job he did not hold for very long."

Russell Stetler testified at the reference hearing that he was a defense investigator during petitioner's trial. In that capacity, he interviewed Juror Charlia S. on July 1, 1991, a few months after the jury had returned the penalty verdict on March 11, 1991. His notes of that interview did not report the juror's words verbatim but paraphrased what she told him about Juror Jose S.'s prior acquaintance with victim Pedersen, as follows: "I think he knew this guy. Something he said to me before he was on the jury. When Pederson [*sic*] was younger, in trouble at the Emporium or something, he counseled him on it." Stetler interviewed Jose S. on July 7, 1991. In that interview, Jose S. denied any prior acquaintance with Pedersen.

Jose S. testified at the hearing and denied any prior acquaintance with victim Pedersen. Trial Juror Andrew N. testified that Jose S. indicated, during the trial, that he had heard of Pedersen but did not know anyone who knew him. Trial Jury Foreperson John C. testified that Jose S. never said anything about Pedersen that indicated he had heard about him before the trial. Trial Juror Allen P. likewise testified that Jose S. never indicated that he knew Pedersen or knew of him.

The referee found that petitioner did not establish by a preponderance of the evidence that Juror Jose S. was personally acquainted with victim Henry Michael Pedersen.

B. *Voir Dire Concealment of Prior Acquaintance*

It is undisputed that at petitioner's capital trial none of the trial jurors was specifically asked on voir dire about prior acquaintance with victim Pedersen. Because Juror Jose S. consistently denied acquaintance with Pedersen, Jose S. was not asked at the reference hearing whether he would have disclosed such an acquaintance had he been specifically asked about it on voir dire. The referee made no findings on this point, concluding that it was unnecessary to do so in light of the finding that Jose S. was not personally acquainted with Pedersen. In his brief on the merits in this court, petitioner concedes that his claim of ineffective assistance of trial counsel, insofar as it is based on counsel's not having specifically inquired during voir dire about prior acquaintance with the victim, is not viable.

## C. *Prejudgment of Penalty Issue*

At the reference hearing, Eugene Sweeters, who was the prosecutor at petitioner's capital trial, testified about Juror Jose S.'s responses on voir dire when asked whether, if petitioner's trial reached the penalty phase, he would consider both penalties, life without possibility of parole and death. On voir dire, Jose S. expressed strong reservations about the death penalty but affirmed that he would consider both penalties and decide the penalty issue based on the particular circumstances shown by the evidence.

Juror Jose S. testified at the reference hearing that he concluded death was the appropriate penalty for petitioner only after he had listened to all the evidence presented at both phases of the trial. Juror Andrew N. expressed the opinion that Jose S. had made up his mind on the penalty issue before deliberations began, but he was unable to provide any facts about what Jose S. said or did that caused him to form that opinion. In her declaration, Juror Charlia S. stated: "I recall thinking when [Jose S.] was put on the jury that the judge should have picked another alternate, that this alternate could not be impartial, that he was determined to decide the case so as to make some sort of point about being gay."

On this issue, the referee provided this summary of the evidence: "There was no evidence that [Jose S.] based his decision on anything other than the evidence presented at both phases of the trial. He stated during voir dire that he was open to deciding which penalty was more appropriate based upon the evidence. He testified during the hearing that he based his decision on all the evidence during both phases of the trial. [Andrew N.'s] testimony was merely his opinion and not based on any specific facts. Similarly, [Charlia S.'s] statement is pure conjecture."

The referee found that petitioner did not establish by a preponderance of the evidence that Juror Jose S. prejudged the issue of penalty.

## D. *Failure or Refusal to Deliberate*

At the reference hearing, Juror Jose S. testified that when deliberations began, he felt that death was the appropriate penalty. A straw vote taken early in the deliberations was 10 to two against the death penalty. Each juror then took three or four minutes to explain his or her position. Jose S. testified that he told the other jurors he was in favor of death, but also that he could change his vote if they gave him a sufficiently persuasive reason to do so. He listened to what the other jurors said, but he never changed his mind because the other jurors never persuaded him that death was not the more appropriate penalty.

In her declaration, Juror Charlia S. stated: "[Jose S.]'s behavior in deliberations was consistent with the determination he showed before deliberations began. He would not listen. He just kept pushing until all the votes were there for death."

Juror Allen P. testified at the hearing that during penalty deliberations Juror Jose S. was a strong advocate for the death penalty. He recalled Jose S. saying he would not change his mind. He also recalled Jose S. engaging with other jurors and arguing his position in favor of the death penalty.

The trial jury foreperson, John C., testified at the hearing that he did not recall Juror Jose S. saying he would never change his vote. On the issue of penalty, all the jurors deliberated and expressed their views. Juror Kathleen K., testifying at the hearing, did not remember anything unusual about Jose S.'s participation in the penalty deliberations.

Juror Andrew N. testified that during penalty deliberations Juror Jose S. announced: " 'I am not going to let you guys just get out of here because of—because you want to go home.' " He did not recall Jose S. saying he would not change his vote, but Jose S. did say he would not change his vote " 'just because y'all want to go home.' " According to his recollection, Jose S. talked a lot during deliberations, listened to the other jurors, and argued in favor of the death penalty.

Juror Thomas S. testified that at the start of penalty deliberations Juror Jose S. announced he would only go for the death penalty. In his opinion, Jose S. did not deliberate but merely stuck to his position; Jose S. seemed to be completely inflexible. He testified that Jose S. did not explain the basis for his position on the penalty issue. Thomas S. testified that he had originally voted for life imprisonment without possibility of parole and that he regretted changing his vote.

On this issue, the referee found that Jurors Jose S. and Andrew N. were credible witnesses. The referee gave less weight to the testimony of Juror Thomas S. and the declaration of Juror Charlia S., providing this explanation: "Both [Charlia S.] and [Thomas S.] seemed to conclude that because [Jose S.] early on stated his position for the death penalty (as apparently did several other jurors) and never changed his mind (contrary to all the jurors who were initially against the death penalty), he failed to deliberate. The referee does not reach this conclusion. The fact that [Jose S.] never changed his mind does not mean that he did not listen to or consider arguments contrary to his position."

The referee provided this summary of her findings on this issue: "[Jose S.] did announce at the beginning of deliberations that he was in favor of the

death penalty, but the evidence before the referee did not show by a preponderance of the evidence that he refused to consider other points of view. He participated in deliberations and interacted with the other jurors. He listened to them and expressed his own views. He did not refuse to speak to other jurors, and he did not separate himself physically from the other jurors."

## III. Legal Principles

"Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) The petitioner "must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus. [Citation.]" (*In re Visciotti* (1996) 14 Cal.4th 325, 351 [58 Cal.Rptr.2d 801, 926 P.2d 987].)

In a proceeding on a petition for a writ of habeas corpus, this court independently reviews a referee's resolution of legal issues and mixed questions of law and fact. (*In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299].) Because the referee observes the demeanor of testifying witnesses, and thus has an advantage in assessing their credibility, this court ordinarily gives great weight to the referee's findings on factual questions. (*In re Avena* (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

## IV. Petitioner's Exceptions to the Referee's Report

In his exceptions to the referee's report, petitioner argues first, that the referee erred in assuming that petitioner had the burden to prove that Juror Jose S. was actually acquainted with victim Henry Michael Pedersen. Petitioner insists that he never alleged in the petition that Jose S. was actually acquainted with Pedersen, and that his "claim that [Jose S.] committed misconduct and was biased rests not on his truthfulness in speaking with [Charlia S.] on issues on which he was not questioned, but on his withholding of the information demanded by the trial court and his display of bias and personal connection to the victim when talking with [Charlia S.] and others." We view this statement as a concession that petitioner is not asserting, and thus is not entitled to relief on the basis of, any claim of juror misconduct or juror bias that depends on the existence of a personal relationship between Juror Jose S. and victim Pedersen. Petitioner does not dispute, and effectively concedes, that the evidence at the reference hearing did not establish the existence of any such relationship.

■ Next, petitioner faults the referee for not acknowledging in her report all of the evidence that Juror Jose S. *claimed* to have known victim Pedersen. We disagree. A referee's report need not describe in detail the evidence presented at the reference hearing. The report need only contain the referee's findings of fact on the reference questions and a summary of the evidence supporting those findings. Evidence that Jose S. claimed to know Pedersen, if believed, might be relevant to petitioner's assertion that Jose S. was biased against petitioner and prejudged the issue of penalty, but it certainly does not compel a finding in petitioner's favor on those issues. Having reviewed the record of the evidentiary hearing, we find no deficiency in the referee's summary of the evidence supporting the finding that Jose S. did not prejudge the issue of penalty.

Petitioner faults the referee for striking the testimony of Michael Gorman, who had written a biography of Juror Jose S. At the hearing, Gorman testified that in the process of writing the book he interviewed extensively both Jose S. and others with knowledge of Jose S.'s life. In his opinion, Jose S. is not a reliable historian of events in his own life and tends to embellish the facts to make himself the hero of every story about his life and to omit or dismiss any facts that might reflect badly on him. At the conclusion of Gorman's testimony, the referee granted respondent's motion to strike all of that testimony as irrelevant to the reference questions.

In her report, the referee had this to say about Gorman's testimony: "Even if Mr. Gorman's opinion had been received into evidence, the referee would have given it very little weight. Mr. Gorman's opinion as to [Jose S.]'s veracity was based on his experience with [Jose S.] while interviewing him for a biography. That context might very well lend itself to [Jose S.]'s making every story about himself, always making himself the hero and the good guy. However, there was no showing of any connection between [Jose S.]'s image of himself . . . and [Jose S.]'s role as juror. In fact, the circumstantial evidence showed that [Jose S.] did not connect the two roles. During the four years Mr. Gorman worked with [Jose S.], [Jose S.] never mentioned the trial. [Jury Foreperson John C.], who several years after the trial joined [an organization of which Jose S. was a prominent member], never had a conversation with [Jose S.] about the trial, although they each acknowledged that they had served on a jury together. In short, Mr. Gorman's opinion that [Jose S.] was not a reliable historian for purposes of his biography does not shed much light on [Jose S.]'s credibility during this proceeding or during the trial."

We agree with the referee on this point. A biographer's opinion that Juror Jose S. tended to embellish his description of his own life to cast himself in the best possible light is only marginally relevant in evaluating his credibility

as to the factual questions that we asked the referee to determine. More important by far are Jose S.'s own testimony at the hearing, where he was subjected to vigorous cross-examination, and the testimony of those who had served with him as jurors at petitioner's trial.

Petitioner takes exception to the referee's response to the second reference question, which asked: "If Jose [S.] was personally acquainted with the victim, would he have disclosed that fact in response to a specific question on voir dire?" Declining to answer this question, the referee explained: "Because Jose S[.] was not personally acquainted with Henry Michael Pedersen, it is not necessary for the referee to make any findings in response to this question." Petitioner argues that, based on evidence adversely reflecting on Jose S.'s credibility as to other matters, the referee should have found that Jose S. would not have disclosed a personal relationship with victim Pedersen had such a relationship actually existed.

The referee's response was appropriate. The referee correctly interpreted the conditional form of the second question as indicating that a response was necessary only if the referee found that Jose S. was personally acquainted with the victim. Because such a personal acquaintance was not proved to exist, no answer to the second question was expected or needed. What Jose S. might have done had he been personally acquainted with Pedersen is entirely speculative and irrelevant to the claims on which this court issued an order to show cause.

■ Petitioner argues next that the referee's finding that Juror Jose S. did not prejudge the issue of petitioner's penalty was based on an incorrect understanding of the meaning of the term "prejudge" in this context. According to petitioner, Jose S. prejudged the penalty because, by his own admission, he formed a firm opinion that death was the appropriate penalty after hearing the evidence but before he began deliberations with the other jurors. But it is not prejudging for a juror to form an opinion about the proper verdict before deliberations begin, provided that the juror's opinion is based on the evidence presented at trial and not on extrinsic matters. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1412 [58 Cal.Rptr.3d 368, 157 P.3d 973]; see also *In re Hitchings* (1993) 6 Cal.4th 97, 119–122 [24 Cal.Rptr.2d 74, 860 P.2d 466].)

Petitioner argues that the referee ignored the rule that a juror's suppression of material information on voir dire supports an inference that the juror has prejudged the case (*In re Hitchings, supra*, 6 Cal.4th at p. 120). Petitioner asserts that this rule applies here because Juror Jose S. suppressed material information during voir dire about his connection with petitioner's roommate, Andre Montgomery, and with prosecution witness Thomas Sherck.

When he killed victim Pedersen, petitioner was living with Andre Montgomery, who worked as a female impersonator at a nightclub. Juror Jose S. worked at the same nightclub and was acquainted with Montgomery, but Jose S. did not disclose his acquaintance with Montgomery to the trial court during voir dire or at any time during petitioner's trial. Montgomery's name was on a witness list that the trial court read at the outset of voir dire, but Montgomery never testified at petitioner's trial.

When interviewed by defense investigator Russell Stetler shortly after the penalty verdict, Juror Jose S. said that during the trial it had dawned on him that petitioner was Montgomery's roommate. He told Stetler that Montgomery had spoken of his roommate as the "romance of the year" and that he, Jose S., had wanted to meet that person.

At the reference hearing, Jose S. testified that he did not recall hearing Montgomery's name read as a potential witness and that he would have disclosed his acquaintance with Montgomery had he heard the name being read. He also testified that he was not very familiar with Montgomery's last name, knowing him mainly as "Andre," and that he might not have made the connection when Montgomery's name was read. He further testified that later, during the trial, he realized that he was acquainted with petitioner's roommate, Montgomery, but he did not believe that he had a legal obligation at that point to disclose this relationship. He said that Montgomery had raved about petitioner as "the shining star," but that he had never seen petitioner with Montgomery.

Thomas Sherck was a prosecution witness at petitioner's capital trial. He there testified that during the afternoon of September 8, 1986, he saw both petitioner and victim Pedersen at the Pendulum, where Sherck worked as a bartender. (*People v. Bolden, supra*, 29 Cal.4th at pp. 526–527.) When he arrived at the trial to testify, Sherck told the prosecutor that he recognized an alternate juror, Jose S. When questioned by the trial court out of the jury's presence, Sherck said he knew Jose S. only through his partner, that he saw Jose S. at most twice a year, and that he did not think Jose S. knew him. When the trial court questioned Jose S., out of the jury's presence, Jose S. said he did not recognize Sherck.

This evidence concerning Juror Jose S.'s relationships with Andre Montgomery and Thomas Sherck does not establish that Jose S. suppressed information on voir dire that was material to any issue at petitioner's capital trial or that demonstrated a bias against petitioner. Montgomery did not testify at petitioner's trial, and there was no evidence that Jose S.'s relationship with Montgomery was likely to prejudice him against petitioner or that Montgomery told Jose S. anything about petitioner that would be likely to

produce a bias against petitioner. Jose S.'s relationship with Sherck was very limited, and his denial that he recognized Sherck was credible. In any event, nothing about Jose S.'s relationship with Sherck was likely to produce a bias against petitioner. Thus, Jose S.'s failure during voir dire to disclose his prior relationships with Montgomery and Sherck does not establish that Jose S. was biased against petitioner or prejudged petitioner's case. (See *People v. Ramos* (2004) 34 Cal.4th 494, 519 [21 Cal.Rptr.3d 575, 101 P.3d 478]; *In re Hamilton* (1999) 20 Cal.4th 273, 300–301 [84 Cal.Rptr.2d 403, 975 P.2d 600].)

Petitioner argues that Juror Jose S. committed misconduct, supporting an inference of bias, by disclosing to a fellow juror, Charlia S., during the trial that he was acquainted with petitioner's roommate, Andre Montgomery. As mentioned earlier, there was no evidence that Jose S.'s relationship with Montgomery was likely to prejudice him against petitioner or that Montgomery told Jose S. anything about petitioner that would be likely to produce a bias against petitioner. Nor is there evidence that Jose S., when he told Charlia S. of his acquaintance with Montgomery, was trying to influence her opinion about any issue in the case or that the information was of the kind that was likely to exert such an influence. Accordingly, Jose S.'s action in disclosing to Charlia S. his acquaintance with Montgomery was not prejudicial juror misconduct, nor did it establish that Jose S. was biased against petitioner.

Petitioner argues that Juror Jose S.'s behavior during deliberations, as reported by his fellow jurors, Charlia S. and Thomas S., supports an inference that he had prejudged the penalty issue. As mentioned above, however, on this issue the referee found Charlia S. and Thomas S. less credible than Jose S. and Andrew N. (See, *ante*, p. 223.) Giving great weight to the referee's credibility determination on this issue, we adopt the referee's finding that Jose S. did not prejudge the penalty issue, but instead based his penalty vote on the evidence presented at both phases of the capital trial.

Petitioner argues that the referee's finding that Juror Jose S. did not refuse to deliberate rests on an incorrect understanding of the meaning of the term "deliberate." We have described a juror's duty to deliberate in this way: "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic

or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate . . . . [Citation.]" (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 [106 Cal.Rptr.2d 313, 21 P.3d 1225].)

The referee's report reflects a correct understanding of a juror's duty to deliberate. The referee found that during deliberations Juror Jose S. listened to the other jurors, considered their points of view (while not being persuaded by them), expressed his own views, and neither refused to speak to other jurors nor physically separated himself from them. Giving great weight to the referee's factual determinations, we adopt the referee's finding that Jose S. did not fail or refuse to deliberate on the issue of penalty at petitioner's capital trial. That finding makes it unnecessary for us to consider the question of prejudice. Thus, we do not decide what showing, if any, would be necessary or sufficient to reverse a judgment of conviction because of a single juror's failure to deliberate when the juror's conduct was not brought to the trial court's attention during the jury's deliberations and the issue was raised for the first time in postverdict proceedings.

Finally, petitioner contends that certain findings that the referee made about the jurors' knowledge of a jail escape plot are "factually erroneous, incomplete, and should be considered only in respect to petitioner's motion for issuance of a second order to show cause." We agree with petitioner that evidence regarding juror awareness of the alleged jail escape plot was not relevant to the claims on which we issued an order to show cause or to the questions on which we directed the referee to make findings. It is apparent from the report that the referee did not rely on this evidence in making any of her findings on the reference questions. Accordingly, we have no occasion here to consider the jail escape plot evidence or the referee's findings in relation to it.

### V. CONCLUSION AND DISPOSITION

■ Giving great weight to the referee's credibility determinations and her factual findings based on those determinations, we conclude that petitioner has failed to prove by a preponderance of the evidence that he was denied effective assistance of counsel at trial by virtue of his trial attorney's failure to ask prospective jurors about their prior acquaintance with victim Henry Michael Pedersen or that Juror Jose S. was biased against petitioner or committed misconduct by failing to disclose a prior relationship with victim Pedersen, by prejudging the issue of penalty, or by failing or refusing to deliberate on the issue of penalty.

Because our order to show cause and our reference order were limited to these claims, we do not here address any other claim set forth in the petition, which will be resolved by a separate order. (See *In re Scott* (2003) 29 Cal.4th 783, 829 [129 Cal.Rptr.2d 605, 61 P.3d 402].)

The order to show cause is discharged.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.