Filed 3/22/16  P. v. Archuleta CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID CLAIR ARCHULETA,<br><br>Defendant and Appellant. | H040641<br>(Santa Cruz County<br>Super. Ct. No. F24813) |

A maintenance truck was stolen from DeLaveaga Golf Course (DeLaveaga) in Santa Cruz on the night of May 9, 2013.  At approximately 4:00 a.m. the following morning, three men used the truck during a burglary and attempted burglary.  The truck was found abandoned and on fire an hour later.  Between 5:00 and 6:15 a.m., a debit card stolen during the burglary was used to make an ATM withdrawal, purchase money orders at a convenience store, and purchase gift cards at two Safeway stores.  The Safeway transactions were captured on surveillance video, as were the burglary and attempted burglary.  Police arrested three men in connection with the crimes:  Adam Jones, Robert Bombaci, and defendant David Clair Archuleta.

Following a four-day trial, a jury convicted Archuleta of unlawful taking of a vehicle (Veh. Code, § 10851); attempted second degree commercial burglary (Pen. Code, §§ 664, 459); second degree commercial burglary (*id*., § 459); grand theft by use of an access card (*id*., § 484g); and arson (*id*., § 451).  On appeal, Archuleta contends there was insufficient evidence to convict him of arson.  He also asserts an ineffective assistance of

counsel claim, an evidentiary challenge, and maintains the trial court erred by not holding a full evidentiary hearing on his posttrial claim of juror misconduct. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Break-ins at the DeLaveaga Maintenance Facility*

DeLaveaga is located in a park in Santa Cruz and is maintained by employees of the Santa Cruz Parks Department. The DeLaveaga maintenance building contains an office and four bays, where equipment is stored. Maintenance vehicles are stored in a fenced-in area located just outside the maintenance building. (The area is fenced on three sides; the maintenance building encloses it on the fourth side.) A gate in the fence is padlocked at night.

On April 29, 2013, DeLaveaga maintenance employees arrived at work to find the employee lockers and the bathroom window in the maintenance building open. The bathroom window screen was off. The key to one maintenance vehicle, a Ford Ranger truck, was missing, as was a key ring with a number of keys, including a key to the padlock used to secure the gate.

On the morning of May 10, 2013, DeLaveaga maintenance employees noticed that the gate was open and the Ford Ranger truck was missing. The padlock that usually secured the gate was intact.

The Ford Ranger, a white pickup truck, said "DeLaveaga Golf Course" on the tailgate. It was in working order prior to being stolen.

A Santa Cruz police officer identified and photographed a shoe print located near the location where the Ford Ranger truck had been parked. An expert in shoe print analysis testified that the shoe print was left by a DC brand shoe. At the time of his arrest on May 22, 2013, Archuleta was wearing black DC brand shoes with white soles.

### B. *Vehicles Observed Near DeLaveaga on the Night of May 9*, *2013*

Timothy Loustalot lives down the road from DeLaveaga. At about 10:00 or 10:30 p.m. on May 9, 2013, he saw two vehicles parked in a turnout across the street

from his house. He testified that one vehicle was a light-colored, late model SUV. The other was a burgundy pickup truck. Loustalot observed a police officer drive up, illuminate the vehicles with a spotlight, and communicate with the drivers.

Santa Cruz Police Officer Ian Burnham testified that he was patrolling the area near DeLaveaga on the night of May 9, 2013. At about 9:45 or 10:00 p.m., on his way towards DeLaveaga, he saw two vehicles pulled off to the side of the road with three men next to them. Burnham stopped to contact the men. He observed that one vehicle was a white Ford F-150 pickup truck. (Officers later discovered that a white Ford F-150 was registered to Michelle Mathieu, Archuleta's wife.) The other vehicle was a two-tone, "Blazer-type SUV." The lower section of the SUV was dark green or dark red. (Jones drives a burgundy Dodge Ram Charger, which has a four-by-four shape.) One of the men approached the patrol car and said he was picking up a friend whose truck had run out of gas. Burnham identified the man he spoke with as Jones. Burnham left and patrolled in the park. He returned about 30 minutes later and saw the men filling up the tank of the Ford F-150 with a large gas can.

Loustalot also saw the men put gas into the light-colored vehicle using a large canister. He testified that after the police officer contacted the men but before they filled up the light-colored vehicle, a small white pickup truck drove away from DeLaveaga.

### C. *Burglary and Attempted Burglary*

Pearce European (Pearce), an auto repair shop, and a Hertz rental car location are located next door to one another in the same building in Capitola. Pearce co-owner, Chris Immel, received a call from the alarm company at about 4:00 a.m. on May 10, 2013, telling him the alarm at the auto repair shop had been activated. Thinking it might be a false alarm, Immel drove to the shop. When he arrived, he saw the front window had been smashed and called the sheriff. Santa Cruz County Deputy Sheriff Dominic Bitonti responded to Immel's call at 4:28 a.m.

A cashbox containing an ATM card and a safe containing approximately $800 in petty cash and the PIN number to the ATM card were missing from Pearce. Pearce surveillance footage shows a truck backing into a parking place in front of the building. The letters "DeLav" are visible on the back of the truck. Someone wearing a black sweatshirt with the hood up and black shoes with white soles can be seen exiting the truck. Later, two other individuals are seen.

A number of unauthorized charges were made to the Pearce ATM card between 5:00 and 6:15 a.m. on May 10, 2013. Those charges included a $600 ATM withdrawal, two charges at DJ's Minimart for $468.29 and $401.50, a $605.95 charge at a Safeway located on Morrissey, and three charges at a Safeway located on 41st Avenue for $201.79, $201.79, and $204.60.

Hertz surveillance videos show a vehicle backing into a parking place in front of the building at 3:52 a.m. on May 10. An individual can be seen standing at a Hertz window for some time. After viewing the video, the Hertz manager noticed that the window was damaged and looked as if someone had tried to pry it open. A total of three individuals are visible in the Hertz footage.

### D. *Vehicle Fire*

At approximately 4:55 a.m. on May 10, 2013, the Santa Cruz County Sheriff's Office received a call reporting that a vehicle was on fire on Carbonera Drive.

Deputy Sheriff Bitonti went to the scene of the vehicle fire after reviewing surveillance video at Pearce. Bitonti testified that the burned vehicle was the vehicle shown in the Pearce surveillance video just prior to the burglary. He recognized the truck because, like the one in the video, it had the letters "DeLa" on the back. Officers confirmed that the burned truck was the vehicle stolen from DeLaveaga based on the vehicle license plate.

Santa Cruz Police Department Detective Paul Deocampo reviewed surveillance video from a residence located near the scene of the vehicle fire. He testified that the

4

video showed a white Ford Ranger truck, like the one stolen from DeLaveaga, drive by at approximately 4:41 a.m. on May 10, 2013. The white Ford Ranger truck was followed by a white Ford F-150. In the video, the vehicles can be seen turning onto Carbonera Drive.

Deocampo testified that he had witnessed between 25 and 30 vehicle fires as a police officer, none of which resulted in the level of damage he observed in the DeLaveaga truck. The damage to the truck was focused in the main cab area. The steering wheel, visors, and rearview mirror had been completely incinerated. Anything flammable in the cab had been destroyed. Even the interior paint had been burned off. Accordingly, Deocampo opined that the fire had been extremely hot.

Deocampo testified that, before becoming a police officer, he worked in the automotive business for 15 years, including five years as a mechanic and 10 years in industrial fabrication. He opined that the fire had not been caused by the fuel line, because he observed no damage to the fuel line, gas cap, or gas tank. He further noted that fuel line fires generally start under the hood or under the vehicle, whereas this fire appeared to have started in the cab. Deocampo also opined that the fire was not caused by faulty wiring, reasoning that a wiring fire would not get sufficiently hot to do the damage he observed. He further testified that the fire was not consistent with any of the mechanical vehicle fires he had observed in the past. In passing, Deocampo referred to the truck as having been "set on fire." When asked whether he could determine the cause of the fire, Deocampo responded "I couldn't. I can only assume."

Officers found a safe and a cash box about 10 or 15 feet away from the truck. The cash box said "Pearce European Japanese, Santa Cruz, California" on it. Pearce co-owner, Courtney Immel, identified the safe and cash box as those stolen from the auto repair shop.

5

## E. *Purchases at DJ's Minimart and Safeway*

The Pearce ATM card was used to make two purchases at DJ's Minimart at 5:32 a.m. and 5:35 a.m. on May 10, 2013. Michael Cortez, a cashier at DJ's Minimart, testified that he sold two money orders to one man at 5:30 or 5:45 a.m. on May 10, 2013. The man was wearing a hat with the hood of a sweatshirt pulled up over it. Shortly before trial, a detective asked Cortez to look at photographs of six individuals and determine whether any of them showed the man to whom he sold the money orders on May 10, 2013. Cortez identified Archuleta as the purchaser of the money orders.

Law enforcement obtained surveillance videos from the Morrissey and 41st Avenue Safeway locations for the time periods surrounding the transactions using the Pearce ATM card. Footage from the Morrissey Safeway shows a white Ford F-150 pull into the parking lot shortly before the unauthorized transactions. Three men participated in the transactions in the Morrissey Safeway. Stills showing their faces were shown to Nicholas Baldrige, a deputy with the Santa Cruz County Sheriff's Office. He identified two of the men as Bombaci and Jones based on prior contacts with those men. Laurel Schonfield, an officer with the Santa Cruz Police Department, identified the third man as Archuleta based on numerous prior encounters with him. In the video, the man Schonfield identified as Archuleta is wearing dark-colored pants and a black sweatshirt with the hood pulled up. A Safeway club card belonging to Susan Bombaci was used during the unauthorized transaction at the Morrissey Safeway. Robert Bombaci's mother, with whom he lived, is named Susan Bombaci.

Surveillance video from outside the 41st Avenue Safeway shows a vehicle drop off one individual. Detective Steve Ryan testified that the vehicle appeared to be the white Ford F-150 registered to Archuleta's wife. Something red the size and shape of a large gas can is visible in the truck bed. Video from inside the store shows the suspect wearing a sweatshirt with the hood up and black shoes with white soles, attire similar to that worn by the individual identified as Archuleta in the Morrissey Safeway video and

6

similar to that worn by one of the suspects in the Pearce surveillance footage.

### F.    Arrests

Police arrested Jones in connection with the stolen truck, burglary, and suspected arson on May 15, 2013.  A five gallon gas can was found in his vehicle, a burgundy Dodge Ram Charger, at the time of his arrest.  Detective Ryan testified, based on Google image searches he had performed, that a Dodge Ram Charger has two doors and a four-by-four shape.  Detective Ryan testified that he found a black hooded sweatshirt with a white Santa Cruz logo in Jones's vehicle, which he described as being "identical" to the sweatshirt seen on one of the suspects in the surveillance videos.

Bombaci was arrested on May 22, 2013.  At that time, a key was found in his pants pocket.  It was later determined that the key opened the padlock used to secure the maintenance fence at DeLaveaga.  Just prior to his arrest, Bombaci was with another individual who was driving the white Ford F-150 registered to Archuleta's wife.  (That individual was neither Archuleta nor his wife.)

Archuleta also was arrested on May 22, 2013.  Detective Deocampo testified that he located Archuleta at a storage facility where Archuleta was trying to break into his own storage unit because he did not have the key.  Deocampo further testified that Archuleta had in his possession tools for lock picking and crow bars.  Deocampo stated that items like those in Archuleta's possession are commonly used for unlawful purposes.  As noted above, Archuleta was wearing black DC brand shoes with white soles when he was arrested.

### G.    Verdict and Archuleta's Motion for a New Trial

After deliberating for an hour and a half on a Friday afternoon, the jury returned verdicts of guilty as to all five counts.

Archuleta moved for a new trial on juror misconduct grounds, among others.  For his juror misconduct argument, he relied on a posttrial questionnaire in which Juror A indicated that Juror B had "push[ed] for a guilty verdict" without deliberations because

she had a conference to attend the following Monday for work. The juror questionnaire further indicated that Juror A "had to fight for" a "thorough discussion" of the evidence and that she and two other jurors "had to push to really peruse the evidence." Accordingly to the questionnaire, "[i]n the end, [the jury] did have a perusal of all of the evidence . . . ." Defendant also requested a hearing to inquire further into the deliberation process. The court denied the motion for a hearing and the motion for a new trial.

### H. Sentencing and Appeal

The trial court sentenced defendant to a term of five years four months in prison on December 6, 2013. The sentence consisted of three years, the upper term on the arson conviction; plus a consecutive eight months, one-third the middle term for unlawful taking of a vehicle; plus a consecutive four months, one-third the middle term for attempted second degree commercial burglary; plus a consecutive eight months, one-third the middle term for second degree commercial burglary; plus a consecutive eight months, one-third the middle term for grand theft by use of an access card.

Defendant timely appealed.

## II. DISCUSSION

### A. Sufficiency of the Evidence Supporting the Arson Conviction

Archuleta challenges his arson conviction on sufficiency of the evidence grounds. He claims there is insufficient evidence to establish (1) the fire was intentionally set or (2) he set it.

#### 1. Standard of Review

"When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Cortes* (1999) 71

8

Cal.App.4th 62, 71.) "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*Ibid*.) Nor do we ask whether *we* " 'believe[] that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

### 2. Substantive Law

"A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property." (Pen. Code, § 451.) Thus, the People were required to establish Archuleta set fire to, burned, caused to be burned, or aided the burning of the truck.

Circumstantial evidence may be relied upon to establish culpability for arson. (*People v. Beagle* (1972) 6 Cal.3d 441, 449, superseded by statute on other grounds as stated in *People v. Castro* (1985) 38 Cal.3d 301, 307-313.) Evidence courts have relied upon in affirming arson convictions in the face of sufficiency of the evidence challenges includes motive evidenced by a threat, the defendant's prior presence in the burned building, the defendant's possession of inflammatory materials, the defendant's presence in the vicinity at the time of the fire, lack of evidence of natural or accidental cause but evidence of intentional cause, more than one fire with temporal and spatial proximity, and the defendant's possession of an instrumentality used to start a fire. (*People v. Beagle*, *supra*, at p. 449.)

### 3. Analysis

Sufficient evidence supports the jury's verdict finding Archuleta guilty of arson. First, there was ample evidence, in the form of surveillance videos, and officer identification, that Archuleta participated in an attempted burglary and burglary using the

stolen DeLaveaga truck. From that evidence, the jury could reasonably infer a motive to destroy the truck and, with it, any evidence of Archuleta's association with the truck. Second, the Hertz and Pearce surveillance videos (combined with the Safeway videos and officers identification) establish Archuleta's presence in the truck approximately one hour before the fire. Third, surveillance video from outside the 41st Avenue Safeway shows Archuleta exit the Ford F-150; a gas can is visible in the truck's bed. Jurors reasonably could infer that the gas can contained inflammatory material (i.e., gasoline), particularly given the testimony that Jones and another man were seen with a vehicle resembling Bombaci's and using a similar gas can to fill up the tank of a white Ford F-150 hours earlier. Fourth, jurors heard testimony regarding a home surveillance video that shows a white Ford F-150 and a white Ford Ranger truck, like the one stolen from DeLaveaga, drive in the vicinity of the fire about 10 or 15 minutes before the fire was reported. Surveillance footage from Pearce and Hertz placed Archuleta in the stolen white Ford Ranger truckabout an hour earlier and surveillance footage from the Safeway locations placed Archuleta in a white Ford F-150 about an hour later. Based on the foregoing evidence, jurors reasonably could infer that defendant was present in the vicinity of the fire at the time it started. Finally, Detective Deocampo could not identify a natural cause of the fire.

Even absent Deocampo's testimony (discussed further below), we conclude the evidence of motive, prior presence in the burned truck, possession of inflammatory materials (the gas can), and presence in the vicinity at the time of the fire are sufficient to support Archuleta's arson conviction.

### B. *Ineffective Assistance of Counsel Claim*

Archuleta maintains his trial counsel rendered ineffective assistance by neither objecting to, nor moving to exclude, Detective Deocampo's testimony suggesting that the truck fire was the result of arson. Specifically, Archuleta argues his counsel should have

10

moved to strike Deocampo's statement that the truck had been "set on fire" and objected that he was not qualified to rule out potential causes of the fire.

### 1. Legal Principles

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." (*Id.* at p. 688.) "It is . . . particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) With respect to prejudice, a defendant must show "there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, at p. 694.)

### 2. Analysis

As noted above, where the record does not demonstrate the reason counsel took certain action or failed to take certain action, an appellate court must reject the defendant's ineffective assistance of counsel claim "unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott*, *supra*, 15 Cal.4th at p. 1212.) Here, the record is devoid

11

of any reason or reasons defense counsel may have elected not to move to strike Deocampo's statement that the truck had been "set on fire." Counsel may have made a tactical decision not to draw the jurors' attention to the passing comment. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [finding no ineffective assistance of counsel when counsel's failure to object could be explained as a tactical decision not to draw the jurors' attention to comments by the prosecutor]; *People v. Milner* (1988) 45 Cal.3d 227, 245 [finding no ineffective assistance of counsel when counsel failed to object to the prosecutor's statements during argument because counsel could reasonably have chosen to ignore the statements rather than draw attention to them by objecting].) Because we cannot say "there simply can be no satisfactory explanation" for counsel's failure to move to strike Deocampo's statement that the truck had been "set on fire," we must reject Archuleta's ineffective assistance of counsel claim to the extent it is based on that conduct.

The record likewise does not disclose any reason why trial counsel may have elected not to object that Deocampo was not qualified to opine that the fire was not caused by the fuel line or by faulty wiring. Counsel may have made the tactical decision not to object based on the reasonable belief that the court would have found Deocampo to be qualified as an expert on vehicle fires based on his five years of experience as a mechanic and 10 years of experience in industrial automotive fabrication. Because a satisfactory explanation for counsel's failure to object exists, we reject Archuleta's ineffective assistance of counsel claim.

Even assuming trial counsel's performance was deficient, Archuleta's challenge fails because he has not established any prejudice resulting from that assumed error. (Cal. Const., art. I, § 13 [prohibiting reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial]; *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 216-217 [to prevail on a claim of ineffective assistance of counsel defendant must show trial counsel's performance was deficient and that deficiency prejudiced

12

defendant].)  As discussed above, there was sufficient evidence to convict Archuleta of arson absent Deocampo's testimony.  Accordingly, there is no reasonable probability that the result of the trial would have been different had trial counsel successfully moved to strike or objected to portions of that testimony.

### C.    *Admission of Evidence of Burglary Tools*

Archuleta argues the trial court erred by admitting Deocampo's testimony that Archuleta possessed tools that may be used for lock picking and unlawful purposes at the time of his arrest.  He contends that testimony was irrelevant or, if relevant, was unduly prejudicial under Evidence Code section 352.

Defense counsel objected to the testimony on relevance grounds at trial.  The court initially sustained that objection, but ultimately overruled it following a side bar.  During the side bar, the court first reasoned that the testimony might be relevant because the lock securing the fenced-in area at DeLaveaga may have been picked.  However, after learning there would be testimony that the previously-stolen key that operates that lock was found on Bombaci, the court indicated its intention to "go with [its] original" ruling.  However, the court changed its mind after the prosecutor argued the tools were relevant to the attempted burglary at Hertz.  The court also concluded the evidence was not more prejudicial then probative.

#### 1.    *Legal Principles and Standard of Review*

Only relevant evidence is admissible.  (Evid. Code, § 350.)  The Evidence Code defines "relevant evidence" broadly as "evidence . . . having *any tendency in reason* to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id*., § 210, italics added.)  " '[T]he trial court has broad discretion to determine the relevance of evidence.' "  (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)  "On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence . . . .' "  (*People v. Hovarter* (2008) 44 Cal.4th

13

983, 1007-1008.)  This court has explained that "[d]iscretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.'  [Citation.]  There must be a showing of a clear case of abuse *and miscarriage of justice* in order to warrant a reversal." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281, italics added (*Shaw*).)  The erroneous admission of evidence is reversible error only if "a different result would have been probable if [the] error . . . had not occurred . . . ." (Code Civ. Proc., § 475.)  " 'Prejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred.' " (*Turman v. Turning Point of Central California, Inc.* (2010) 191 Cal.App.4th 53, 58.)  It likewise is appellant's burden to establish abuse of discretion. (*Shaw*, *supra*, at p. 281.)

A trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  For purposes of Evidence Code section 352, evidence is "prejudicial" if it " ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 (*Kipp*).)  " ' "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.)  "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*Kipp*, *supra*, at p. 1121.)

14

### 2. Admission of the Testimony Regarding Burglary Tools Did Not Constitute Prejudicial Error

The attempted burglary suspects tried to break into Hertz by prying open a window. Accordingly, the trial court did not abuse its discretion in concluding Deocampo's testimony that Archuleta possessed crow bars and tools used for lock picking at the time of his arrest was relevant to whether Archuleta was guilty of the charged offense of attempted second degree commercial burglary.

With respect to Evidence Code section 352, the probative value of the testimony was low, as there was no evidence linking the tools found on Archuleta to the Hertz attempted burglary. However, the probability that the testimony's admission would create a substantial danger of undue prejudice also was minimal. There was substantial evidence that Archuleta attempted to burglarize Hertz and aided in the Pearce burglary—namely, the Pearce, Hertz, and Safeway surveillance videos and the resulting officer identifications. Thus, evidence that he possessed burglary tools would hardly have surprised jurors, let alone " ' "evoke[d in them] an emotional bias against defendant . . . ." ' " (*Kipp*, *supra*, 26 Cal.4th at p. 1121.) We therefore perceive no abuse of discretion in the court's conclusion that the probative value of the testimony was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice.

Even assuming the trial court abused its discretion in admitting the testimony, that error was harmless. Generally, the admission of evidence in violation of state law, here Evidence Code section 352, is reversible only upon a showing that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) A due process clause violation, requiring review under the more stringent federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18, occurs where the admission of the evidence "makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

15

The admission of the testimony was not " 'so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Accordingly, we apply the *Watson* harmless error standard. Because the testimony merely was cumulative of other evidence that Archuleta engaged in burglary activities, he fails to show a reasonable probability that the trial court's ruling, even if error, affected the outcome of his case.

### D. *Juror Misconduct*

Finally, Archuleta asserts the trial court erred by failing to hold a full evidentiary hearing on the allegation of juror misconduct raised in his motion for a new trial. He contends the juror questionnaire he submitted to the trial court indicated at least one juror refused to deliberate, and that a hearing was required to determine whether other jurors were pressured into reaching a verdict without adequate deliberations.

#### 1. *Standard of Review and Governing Legal Principles*

"We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct." (*People v. Carter* (2003) 30 Cal.4th 1166, 1216.)

"The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Citation.] Defendant is not, however, entitled to an evidentiary hearing as a matter of right." (*People v. Avila* (2006) 38 Cal.4th 491, 604.) "A court must hold an evidentiary hearing on alleged jury misconduct only when the defendant shows 'a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 55.) "These restrictions are necessary because allowing routine postverdict juror examinations ' "would open the

16

door to harassment of jurors and . . . ultimately damage the jury process and the administration of justice." ' " (*Ibid.*)

Jurors have a duty to deliberate. (*In re Bolden* (2009) 46 Cal.4th 216, 228.) " 'A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury.' " (*Ibid.*) A refusal to deliberate constitutes misconduct. (*People v. Lomax* (2010) 49 Cal.4th 530, 589.)

### 2. Analysis

Archuleta fails to show the trial court erred in finding the juror questionnaire insufficient to warrant further inquiry for two reasons. First, the juror questionnaire did not show " 'a strong possibility that prejudicial misconduct . . . occurred.' " (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 55.) Rather, the questionnaire showed only that one juror initially indicated a desire not to deliberate and attempted to convince others to do the same, but that three or more jurors successfully fought for a discussion of the evidence. The questionnaire does not indicate that any juror ultimately failed to engage in the deliberations when they occurred. Second, the only evidence of the alleged misconduct—the juror questionnaire—presented no " 'material conflict that [could] only be resolved at [an evidentiary] hearing.' " (*Ibid.*) Accordingly, we find no abuse of discretion in the trial court's denial to Archuleta's request for an evidentiary hearing.

## III. DISPOSITION

The judgment is affirmed.

17

_____

Premo, J.

WE CONCUR:


_____

Rushing, P.J.


_____

Elia, J.


People v. Archuleta
H040641